IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BENITA PICAZO CARRANZA,

                    Plaintiff,

          v.

UNITED STATES OF AMERICA, and
JOHN DOES FEDERAL LAW
ENFORCEMENT AGENTS 1-5,

                    Defendants.

Civ. No. 3:12-cv-02255-AC

OPINION AND
ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Defendants United States and John Doe Federal Law Enforcement Agents 1-5 ("Defendants A-E") (collectively "Defendants") move to dismiss plaintiff Benita Picazo Carranza's ("Carranza") claims pursuant to Rule 12(b)(1) and Rule 12(b)(6). Carranza brought this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), seeking relief in the form of money damages. Defendants filed their motion to dismiss arguing: (1) there is no subject matter jurisdiction for claims against Defendants A-E in their official capacity, and (2) the complaint fails to state actionable tort claims under Oregon law. Specifically, Defendants

argue the complaint does not plead facts sufficient to state claims for invasion of privacy, intentional infliction of emotional distress ("IIED"), or abuse of process. Carranza concedes that claims brought under the FTCA are cognizable only as against the United States, but argues her complaint contains well-pleaded factual allegations giving rise to entitlement to relief for all three tort claims. Defendants reply that under Oregon law, Carranza's complaint fails to adequately allege any claim for relief.

Because Carranza has conceded that she may not state FTCA claims against Defendants A-E in their official capacities, those claims are dismissed under 12(b)(1). Therefore, Carranza's claims should be deemed as brought against the United States only.

Defendants submitted the declaration of Robert Hyde ("Hyde") in support of their motion to dismiss. On a motion to dismiss under 12(b)(6), the court examines whether a plausible claim for relief is stated, not the merits of the claim. The Hyde declaration contains paragraphs and exhibits on the merits of Carranza's claim. To the extent the Hyde declaration and exhibits present facts bearing on the merits, the court will not consider them. Viewing Carranza's claims against the United States in this context, Defendants' motion to dismiss under 12(b)(6) is denied, for the reasons set forth below.

*Background*

Carranza's claims arise out of her arrest and detainment by Defendants A-E, believed to be law enforcement officers of Immigration and Customs Enforcement ("ICE"). Defendants A-E arrested Carranza on the pretense that she was not a legal resident of the United States. (Complaint ("Comp.") ¶¶ 23-25.) At the time of her arrest, Carranza lived in Keizer, Oregon with her two young daughters and her parents. (Comp. ¶¶ 5, 58.)

In her complaint, Carranza alleges that on March 1, 2012, Defendants A-E came to her home, whereupon Carranza stepped onto her porch to speak with Defendant A. (Comp. ¶ 10.) Defendant A handcuffed Carranza and put her in the back of a car. (Comp. ¶ 40.) Defendant A denied Carranza's request to call her lawyers. (Comp. ¶¶ 27, 29, 37, and 40.) Carranza saw her daughters and parents watching from the house and crying. (Comp. ¶ 41.) Defendant D told Carranza they were looking for her brother, Moises Reyes ("Reyes"), a wanted fugitive. (Comp. ¶¶ 45-51.) Carranza told Defendant D that neither she nor her parents had heard from Reyes in ten years. (Comp. ¶¶ 52-56.) Defendant D said to Carranza:

> Well, you know who you should be thanking for ruining your life like this right? So when you get to Mexico, because that's where you will be going, you should give your brother a call and thank him for that! It is just a matter of time but I will come back and get your Dad and then your Mom and every family member. I mean, look at what happened to your brother Armando, where is he now, he is in Mexico! And your other sister will also be there shortly so again your brother is the person to thank for everything that is going on in your lives.

(Comp. ¶ 74.) Defendant D continued threatening Carranza and her family, saying:

> Well, I'm just saying I don't know if you want to give your girls' future up for someone, because not only are you going to be sent to Mexico but I will take your girls and place them in a foster home where they will not know who the family is, and where you will never see them again.

(Comp. ¶ 78.)

Defendant D asked permission to enter Carranza's home. (Comp. ¶ 97.) Defendants A-E did not have a warrant to search Carranza's home. (Comp. ¶¶ 98-99.) Carranza told Defendant D that her mother was sick, her daughters were in the house, and again asked to call her lawyer. (Comp. ¶ 102.) Defendant D responded: "No you cannot make any phone calls and if you don't let me in your house I will just come back over and over until I go in. I'm gonna come back tomorrow and the following day." (Comp. ¶ 103.) Defendant D counted the days on his fingers and said, "I just want to make sure your brother is not in there." (Comp. ¶ 103.) Defendant D

told Carranza he would not speak with her parents or children. (Comp. ¶ 105.) Carranza consented to a limited search of her home because she believed Defendant D would follow through on his threats. (Comp. ¶¶ 106-108.)

Defendants A-E entered Carranza's home. (Comp. ¶ 111.) While in Carranza's home, Defendant D spoke with Carranza's parents and interacted with her five-year-old daughter. (Comp. ¶¶ 115-127.) Defendant D threatened Carranza's parents that he would go to each of their sons' houses looking for Reyes. (Comp. ¶ 123.) Defendants completed their search of Carranza's home and did not find Reyes. (Comp. ¶ 133.)

Defendants transported Carranza to the ICE detention facility in Portland, Oregon. (Comp. ¶ 134.) Defendant D again threatened to deport Carranza and her family if she did not help him find Reyes. (Comp. ¶¶ 138-142.) Carranza repeated that she did not know how to find Reyes. (Comp. ¶ 143.) Defendant D continued to threaten Carranza with deportation and placing her daughters in foster care. (Comp. ¶ 150.) Carranza thought of instances from her childhood and became emotionally distressed thinking of what might happen to her daughters if she were deported. (Comp. ¶ 155.) As a child Carranza worked on the streets and was sexually abused. (Comp. ¶ 155.) She also witnessed other children get beaten, abused, and killed. (Comp. ¶ 155.)

Eventually Carranza's attorneys came to the ICE facility and spoke with her. (Comp. ¶ 158.) Defendant E told the attorneys Carranza was being transported to another facility because she was not cooperating. (Comp. ¶ 159.) Carranza's attorneys informed Defendants that Carranza was eligible for and in the process of obtaining permanent resident status. (Comp. ¶ 160.) Carranza was transported to another facility and held overnight. (Comp. ¶ 162.)

Defendant D communicated to other ICE officers that Carranza should not be released. (Comp. ¶ 163.)

On March 2, 2012, Carranza's attorney delivered a packet of information to ICE, outlining the forms of relief Carranza was eligible for and requesting her release. (Comp. ¶ 174.) Defendant E then told Carranza that she was to be released. (Comp. ¶ 175.) Defendant E returned Carranza's possessions to her, but her business card had been removed from her wallet. (Comp. ¶ 178.) Defendant E told Carranza that Defendant D is not stopping and might call Carranza's employer. (Comp. ¶ 179.) Carranza reiterated that she did not have any information about Reyes. (Comp. ¶ 180.)

### Legal Standard

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court addressed the pleading standard to adequately state a claim under the Federal Rules of Civil Procedure. Rule 8(a) governs pleadings and calls for "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." FED. R. CIV. P. 8(a) (2009). *Twombly* emphasized the need to include sufficient facts in the pleading to give proper notice of the claim and its basis: "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (brackets omitted). Even so, the court noted that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Since *Twombly,* the Supreme Court made clear that the pleading standard announced therein is generally applicable to cases governed by the Federal Rules of Civil Procedure, and not just those cases involving antitrust allegations.

> As the Court held in *Twombly*, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555) (internal citations omitted); *see also Villegas v. J.P Morgan Chase & Co.*, No. C 09-00261 SBA, 2009 U.S. Dist. LEXIS 19265, at *7-8 (N.D. Cal. Mar. 6, 2009) ("The Twombly standard, moreover, is of general application and is as easily applied to wage and hour litigation as antitrust."). The Court went on to identify two principles informing the decision in *Twombly*. First, although the court must assume true all facts asserted in a pleading, it need not accept as true any legal conclusions set forth in a pleading. Second, the complaint must set forth a plausible claim for relief and not merely a possible claim for relief. The Court advised that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 129 S. Ct. at 1949-50 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-158 (2nd Cir. 2007)). In conclusion, the Court wrote: "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.

*Discussion*

I.    <u>The Federal Tort Claims Act</u>

The FTCA gives the court subject matter jurisdiction over certain claims against the United States for injuries caused by the negligent or wrongful act or omission of any government employee acting within the scope of employment. 28 U.S.C. § 1346(b)(2). Jurisdiction over these claims is limited to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* Thus, the United States is liable for tort claims under the FTCA "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

The FTCA provides an exception to the United States' liability for "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). However, the FTCA's law enforcement proviso restores the United States' liability for claims arising out of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" committed by a federal law enforcement officer. *Id.*

The United States' liability under the FTCA is based solely on the liability of a private party under local law. *United States v. Olson*, 546 U.S. 43 (2005). In *Olson*, the Supreme Court reversed Ninth Circuit precedent that allowed courts to waive the United States' sovereign immunity in certain instances where local law would make a state or municipal entity liable. *Id.* at 44. The Court held the FTCA does not waive sovereign immunity under circumstances where the United States would be liable if it were a state or municipal entity. *Id.* at 45-46. Regarding the language "in the same manner and to the same extent as a private individual under like

circumstances," the Court held the United States is liable where a federal employee's conduct is analogous to behavior that would be tortious if performed by a private party. *Id.* at 46-47. When the allegedly tortious conduct arises out of "uniquely governmental functions," courts should still consider whether analogous private party conduct would be subject to tort liability. *Id.*

Applying *Olson*, the Ninth Circuit reversed a grant of summary judgment and allowed several tort claims to be brought against the United States based on the actions of federal law enforcement officers serving search and arrest warrants. *Tekle v. United States*, 511 F.3d 839 (9th Cir. 2007). In *Tekle*, the court held the United States may be liable for torts committed by federal law enforcement officers while acting within their statutory authority. *Id.* at 852. The Court reasoned "it is the very purpose of the FTCA to hold the United States liable for torts committed by a government employee 'while acting within the scope of his office or employment.'" *Id.* (quoting 28 U.S.C. § 1346(b)).

In *Tekle*, a thirteen-year-old boy sued the United States pursuant to the FTCA. *Id.* at 840. The plaintiff (only eleven at the time) was taking out trash at his home when federal agents arrived to serve arrest warrants on his parents. *Id.* at 842. The plaintiff initially ran towards his house, but stopped when the agents commanded him to turn around and lie face down. *Id.* at 843. While on the ground, the agents held a gun to his head, handcuffed him, and searched him. *Id.* The agents pulled him up by the handcuffs and sat him on the sidewalk where he sat with his bare feet in the gutter for fifteen minutes before the handcuffs were removed. *Id.* About twenty agents continued to point their guns at the plaintiff, he was not allowed to use the restroom unsupervised, and an agent threw the plaintiff's shoes on the ground and spit on them. *Id.* The Ninth Circuit analyzed the liability of a private party for false arrest, assault and battery, and IIED. *Id.* at 854. Although the agents were acting within the scope of their employment, the

court held the plaintiff raised genuine issues of material fact about whether the agents acted beyond the scope of their authority and reversed summary judgment on all three claims. *Id.* at 854-856.

Like the plaintiff in *Tekle*, Carranza alleges that federal law enforcement officers committed tortious conduct, beyond their authorization, while acting within the scope of their employment. Carranza alleges that Defendant D threatened her and her family, intending to inflict severe emotional distress on her, obtain her involuntary consent to enter her home, and obtain information about her brother, Reyes. (Comp. ¶ 79.) Carranza also alleges that Defendants were not authorized to use the immigration detention process against her for the ulterior purpose of obtaining information about Reyes. (Comp. ¶ 201.) Because Carranza is suing pursuant to the FTCA, the court looks to the liability of private parties in analogous situations and under Oregon law when examining the alleged conduct of Defendants A-E.

A.    *Invasion of Privacy*

Defendants move for dismissal of Carranza's invasion of privacy claim. Defendants argue that Carranza failed to adequately allege Defendants lacked consent to enter and search her home or Defendants intended to cause an unauthorized intrusion. Defendants also argue that the FTCA does not apply to Fourth Amendment violations. Carranza responds that the complaint alleges her consent was given under duress, and was therefore involuntary; it is therefore plausible that Defendants lacked a reasonable belief, after issuing the specific threats to Carranza, that her consent was voluntarily given. Carranza also argues that, under the FTCA, government actors can be held liable for uniquely governmental functions.

A claim for invasion of privacy may take one of four forms: "(1) intrusion upon seclusion; (2) appropriation of another's name or likeness; (3) false light; and (4) publication of

private facts." *Mauri v. Smith*, 323 Or. 476, 482 (1996), citing *Humphers v. First Interstate Bank*, 298 Or. 706, 714 (1985). Under Oregon law, the tort of invasion of privacy based on a theory of intrusion on seclusion has three elements that must be proven: "(1) an intentional intrusion, physical, or otherwise, (2) upon plaintiff's solitude or seclusion, or private affairs or concerns, (3) which would be highly offensive to a reasonable person." *Id.* at 483. At issue here is the first element, whether Defendants' conduct constituted an "intentional intrusion."

An "intentional intrusion" is a nonconsensual intrusion. *Id.* at 484 (citing *Gilmore v. Enogex, Inc.*, 878 P.2d 360, 366 (Okla. 1994)). Under Oregon law, an invasion of privacy claim requires proving that the defendant lacked consent. *Leggett v. First Interstate Bank of Oregon, N.A.*, 86 Or.App. 523, 528 (1987). The Oregon Supreme Court follows the *Restatement (Second) of Torts* with respect to the tort. *Mauri*, 324 Or. at 482-484. It provides that "[c]onsent is not effective if it is given under duress." RESTATEMENT (SECOND) OF TORTS § 892B(3) (1979). The comment to subsection (3) reads, in the relevant portion:

> The cases to date in which duress has been found to render the consent ineffective have involved those forms of duress that are quite drastic in their nature and that clearly and immediately amount to an overpowering of the will. These include force or threats of force against the person consenting or the members of his immediate family or his valuable property; and also arrest, imprisonment or prosecution upon a serious criminal charge of the person consenting or a member of his family, as well as immediate threats of that force.

RESTATEMENT (SECOND) OF TORTS § 892B(3) cmt. j (1979).

First, the parties dispute whether Carranza pleads the element of lack of consent. Accepting the allegations of the complaint as true and drawing all reasonable inferences in favor of Carranza, the court finds she has properly pleaded this element. Carranza was not informed of the warrant for her arrest or advised of her rights before or after being handcuffed and placed in the back of the car. Defendants told Carranza that she had a criminal record and a deportation

order. After Carranza acknowledged not having a green card, Defendants denied her request to call her lawyer, handcuffed her, and put her in the back of a car. While Carranza was handcuffed in the back of the car, Defendants threatened the deportation of Carranza and her family, and threatened to have her daughters placed in foster care so that she would never see them again. Defendants made these threats to coerce Carranza's consent to enter her home, and Carranza believed Defendants' threats. Fearing she would lose her daughters, Carranza consented to the search of her home. Based on the above facts, the complaint adequately alleges that Carranza's consent was ineffective because she was under duress when she consented.

Second, Defendants argue that Carranza fails to plead Defendants' intent to cause an unauthorized intrusion. However, the complaint pleads sufficient facts to plausibly allege that Carranza's consent was ineffective and that Defendants knew the consent was ineffective. Defendants did not have a warrant and knew they needed Carranza's consent to search her home. Defendants were at Carranza's home looking for Reyes, and had no reason to think Reyes was there other than that Reyes and Carranza are related. Nonetheless, Defendants arrested Carranza and threatened to deport her and separate her from her daughters unless she helped them find Reyes. Carranza could see that her children and parents were visibly upset. Finally, Carranza consented to the search only because she believed Defendants' threats. If Defendants knew that Carranza's consent was ineffective because it was coerced and nonetheless entered Carranza's home, it is reasonable to infer that Defendants intended to cause an unauthorized intrusion.

Third, Defendants argue that Carranza can not bring a claim for violating the Fourth Amendment under the FTCA. Defendants argue that the Fourth Amendment protects individuals from government intrusion, and therefore the United States cannot be held liable under the FTCA for violating the Fourth Amendment because the FTCA holds the United States liable

only to the same extent a private party could be liable. However, in her complaint, Carranza does not allege her consent was obtained or her home unlawfully searched in violation of the Fourth Amendment. Carranza alleges that Defendants threatened the well-being of her and her family in order to coerce her consent and cooperation. Carranza's point is that under those circumstances her consent was ineffective, no matter to whom it was given, because it was given while she was under duress. Defendants' argument misses the point; the Fourth Amendment is not relevant to Carranza's claim.

Finally, both parties also dispute the scope of Carranza's consent and whether Defendants' search went beyond that scope. However, the court need not explore this issue because the complaint pleads facts sufficient to support a claim for invasion of privacy based on a theory of intrusion on seclusion.

For these reasons, Defendants' motion to dismiss Carranza's claim for invasion of privacy is denied.

B.    IIED

Defendants move for dismissal of Carranza's IIED claim. Defendants argue that Carranza failed to allege Defendants intended to cause her severe emotional distress or that she suffered severe emotional distress. Defendants also argue their statements and actions did not rise to the level of intolerable conduct. Carranza responds that she sufficiently alleged Defendants' intent to cause her severe emotional distress and that she suffered severe emotional distress as a result of their conduct. Carranza also argues that whether Defendants' conduct was intolerable is a fact-specific inquiry that must take into account the special relationship created when Defendants took her into custody.

Under Oregon law, to set out a claim for IIED, a plaintiff must plead plausible facts establishing three elements: "(1) the defendant intended to inflict severe emotional distress on the plaintiff; (2) the defendant's acts were the cause of the plaintiff's severe emotional distress; and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Babick v. Oregon Arena Corp.*, 333 Or. 401, 411 (2002). Defendants argue the complaint pleads no plausible facts meeting any of the three elements.

      1.   <u>Intent</u>

The Oregon Supreme Court follows the *Restatement (Second) of Torts* definition of intent. *Id.* at 411-412 (citing *McGanty v. Staudenraus*, 321 Or. 532, 550-551 (1195)). Accordingly, at the motion to dismiss stage the plaintiff must allege the defendant desired to inflict severe emotional distress or knew such distress was substantially certain to result from a volitional act. *Id.* at 412. In *Babick*, the Oregon Supreme Court held that plaintiffs need allege only that a defendant "acted with a purpose of causing plaintiffs severe emotional distress." *Id.* The plaintiffs in *Babick* alleged: "In so acting, defendant . . . intended to . . . inflict severe emotional distress on plaintiffs." *Id.* The *Babick* court held this allegation of intent was sufficient to get past the motion to dismiss stage. *Id.*

Here, similar to the plaintiffs in *Babick*, Carranza alleges that Defendants intended to inflict severe emotional distress on her and she alleges intent with far more detail than did the plaintiffs in *Babick*. Carranza asserts:

> Defendant D intended to inflict severe emotional distress upon Plaintiff by threatening to send her to Mexico and take her girls and place them in a foster home where they will not know who the family is and where she will not see them again, for the purpose of securing consent to search her residence, and for the purpose of obtaining information from Plaintiff as to the whereabouts of Plaintiff's brother. Defendant D knew that severe emotional distress was certain, or substantially certain, to result from his conduct.

(Comp. ¶ 192.) Carranza expressly pleads intent by and knowledge of defendants regarding the likely consequence to Carranza of their actions, physical and verbal. Accordingly, under Oregon law, Carranza's allegations meet the standard for pleading intent.

### 2. Causation of Severe Emotional Distress

Defendants also argue that Carranza fails to allege that she suffered severe emotional distress, and therefore Defendants' actions could not have caused severe emotional distress. Emotional distress includes "all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965). Under Oregon law, objective evidence of severe emotional distress, such as medical, economic, or social problems, is not required to prove a plaintiff suffered emotional distress. *Bodewig v. K-Mart, Inc.*, 54 Or. App. 480, 488 (1981). Comment j to the *Restatement* section 46 explains that: "Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965). Furthermore, "[b]ecause proof of intent is often indirect and evidence of psychic harm is usually self-serving, proof of this tort largely turns on . . . whether a defendant's conduct is sufficiently outrageous." *House v. Hicks*, 218 Or. App. 348, 358. Accordingly, the court considers the character of Defendants' conduct when determining the alleged severity of Carranza's emotional distress, and thus turns to the final element of an IIED claim.

### 3. Extraordinary Transgression of the Bounds of Sociable Tolerable Conduct

Defendants argue that their statements and behavior towards Carranza do not constitute "an extraordinary transgression of the bounds of social tolerable conduct" because they were based on the realities of Carranza's legal status. Carranza replies that Defendants created a

special relationship with her when they assumed physical custody over her, and their threats were "outrageous in the extreme." She argues that Defendants had a greater obligation to refrain from abusive, frightening, and shocking behavior than do strangers in an arm's-length encounter with one another.

Determining whether conduct is extreme or outrageous requires a factual inquiry, on a case-by-case basis, that examines the circumstances in their entirety. *Delaney v. Clifton*, 180 Or. App. 119, 130 (2002). Under Oregon law, the existence of a special relationship between parties bears on the characterization of particular conduct as extreme or outrageous. *Id.* The abuse of position or authority (actual or apparent) by an actor can be determinative of whether conduct is outrageous or extreme. RESTATEMENT (SECOND) OF TORTS § 46 cmt. e (1965). When determining whether conduct was outrageous or extreme, Oregon courts will also look to whether the actor had an ulterior purpose or took advantage of a vulnerable individual. *Checkley v. Boyd*, 198 Or. App. 110, 125 (2000).

In their reply, Defendants rely on *Pakos v. Clark* and argue that their conduct did not rise to the level required for IIED. The plaintiff in *Pakos*, a former mental patient, alleged that officers: (1) told him he was "crazy as a bedbug"; (2) told him they were going to readmit him to the mental hospital; (3) told him they would take his children away; and (4) made taunting facial gestures at him. 253 Or. 113, 119-120 (1969). The plaintiff was not under arrest and left the sheriff's office at least once during the encounter. *Id* at 119. The Oregon Supreme Court held that the conduct complained about was not actionable. *Id.* at 132.

Unlike the plaintiff in *Pakos*, Carranza was under arrest and in custody the entire time she alleges Defendants inflicted severe emotional distress on her. Carranza alleges that Defendants created a special relationship when they took her into custody and had a heightened obligation

towards her.  Defendants then threatened Carranza in front of her children and parents, who were crying and visibly upset.  Defendants' threats continued after Carranza was brought to the detention facility.  In light of the seriousness of the situation, the threat of losing them forever could reasonably be perceived as being legitimate.

Carranza's IIED claim turns in large part on whether a special relationship existed between Defendants and Carranza under Oregon law.  Carranza alleges that Defendants created a special relationship and they therefore "had a greater obligation to refrain from subjecting Plaintiff to abuse, fright, or shock than would be true in arm's length encounters among strangers." (Comp. ¶ 194.)  The *Restatement (Second) of Torts* section 314A(4) states, "One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."  RESTATEMENT (SECOND) OF TORTS § 314A(4) (1965).  The current version of this section of the *Restatement* states in relevant part:

> (a) An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship.
>
> (b) Special relationships giving rise to the duty provided in Subsection (a) include:
>
> . . .
>
>     (7) a custodian with those in its custody, if:
>         (a) the custodian is required by law to take custody or voluntarily takes custody of the other; and
>         (b) the custodian has a superior ability to protect the other.

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 40 (2012).  Although Oregon has not specifically adopted either provision, Oregon courts look to the *Restatements* for "useful guidance regarding the duty imposed as the result of a special relationship or status." *Stewart v. Kids Inc. of Dallas, OR*, 245 Or.App. 267, 278 (2011).  Furthermore, this court recently recognized a special relationship existed between the United States Marshall Service and a

prisoner in their custody. *Crane v. United States*, 3:10-CV-00068-AC, 2013 WL 1453166 (D. Or. Mar. 21, 2013) *report and recommendation adopted*, 3:10-CV-00068-AC, 2013 WL 1437816 (D. Or. Apr. 9, 2013). For the reasons stated above, the court finds that a special relationship existed between Defendants and Carranza while she was in their custody.

Accepting the allegations of the complaint as true and drawing all reasonable inferences in favor of Carranza, the complaint sufficiently alleges that she suffered severe emotional distress caused by Defendants' behavior. A special relationship was created when Defendants exercised complete physical control over Carranza by taking her into custody. Carranza alleges Defendants' threats "constituted an extraordinary transgression of the bounds of socially tolerable conduct." Carranza also alleges Defendants preyed on her vulnerabilities with the ulterior purpose of obtaining information about Reyes. Specifically, Defendants handcuffed Carranza and put her in the back of a car while her daughters watched. Then, while she could see her daughters and parents watching and crying, Defendants threatened to deport her and permanently take her daughters away from her. This caused Carranza severe emotional distress. While Carranza was detained at the ICE facility, Defendants again threatened to take Carranza's daughters from her. Carranza recalled working on the streets as a child and being sexually assaulted. She saw other children get beaten, abused, and killed. She feared what would happen to her daughters if they were taken from her. The repeated threats of losing her daughters frightened Carranza and resulted in the infliction of severe emotional distress.

For the above reasons, Carranza has adequately pleaded IIED and Defendants' motion to dismiss Carranza's IIED claim is denied.

C.    *Abuse of Process*

Defendants move for dismissal of Carranza's abuse of process claim. Defendants argue that Carranza cannot claim abuse of process because there was probable cause to arrest and detain her, regardless of any alleged ulterior motive. They also argue that Carranza has not pleaded sufficient facts to show the immigration detention process was initiated for any purpose other than to secure her presence at immigration and removal proceedings. Carranza responds that the sole purpose for the immigration detention process is to conduct immigration and removal proceedings, and the complaint alleges Defendants abused the immigration detention process when they used it to coerce information from her regarding a collateral matter.

The Oregon Supreme Court has explained the requirements for a viable abuse of process claim:

> "[F]irst, an ulterior purpose, and second, a willful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club."

*Larsen v. Credit Bureau*, 279 Or. 405, 408 (quoting Prosser, Law of Torts 857, § 121 (1971)).

Before determining whether Carranza has alleged abuse of process, the court must determine the purpose of the immigration detention process. Carranza argues that the only legitimate use of the immigration detention process is to ensure a party's appearance in immigration and removal hearings. Carranza's argument is supported by published ICE standards: "ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to

public safety, or for whom detention is mandatory by law." U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, ICE PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011, PREFACE BY JOHN MORTON, DIRECTOR (2011).  Also consistent with Carranza's argument, the Supreme Court has held that detaining deportable criminal aliens pending removal proceedings serves the purpose of preventing them from fleeing prior to or during removal proceedings. *Demore v. Kim*, 538 U.S. 510, 528 (2003).  Furthermore, in a memorandum regarding detention priorities, ICE director John Morton writes: "Absent extraordinary circumstances or the requirements of mandatory detention, field office directors should not expend detention resources on aliens who . . . demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest." http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf. (last visited June, 5 2013).  Finally, Defendants do not argue there is any other purpose for the immigration detention process.  Thus, the court finds that the legitimate purpose of the immigration detention process is securing the presence of parties for immigration and removal proceedings.

Defendants correctly argue that an ulterior purpose does not invalidate the probable cause arrest and detention of Carranza.  However, "[a]buse of process is the perversion of the legal procedure to accomplish an ulterior purpose when the procedure is commenced in proper form and with probable cause." *Kelly v. McBarron*, 258 Or. 149, 154 (1971).  Carranza does not dispute the validity of her arrest and detention; she alleges Defendants willfully used the immigration detention process against her for the illegitimate purpose of attempting to coerce information about Reyes from her.

Accepting the allegations of the complaint as true and drawing all reasonable inferences in favor of Carranza, the court finds that Carranza has sufficiently pleaded that Defendants used

the immigration detention process not to detain Carranza pursuant to an outstanding removal order, but to compel her to divulge the whereabouts of her brother, Reyes. After briefly questioning Carranza about her legal status in the United States, Defendants' inquiry focused on the whereabouts of Reyes. Defendants told Carranza that it was Reyes's fault that she was being deported. Defendants accused Carranza of lying about Reyes's whereabouts. Defendants threatened to deport Carranza and separate her permanently from her daughters if she did not help them find Reyes. While Carranza was handcuffed in a car, Defendants searched her home for Reyes. Defendants told Carranza's parents that they would go to all of their sons' houses looking for Reyes. After moving Carranza to an ICE detention facility, Defendants continued to question her about Reyes's whereabouts. Defendants told Carranza's attorneys she was being held because she was not cooperating. Defendants instructed other ICE agents not to release Carranza. It can reasonably be inferred that Defendants detained Carranza for the purpose of coercing her cooperation and that of her family in their search for Reyes.

Defendants argue that Carranza's arrest and detention occurred because of her illegal status. They argue that the fact she was released after her immigration attorney made Defendants aware of mitigating circumstances highlights that there was not an abuse of process. However, the facts as pleaded plausibly connect Carranza's arrest and detention with Defendants' premeditated search for Reyes. Carranza sufficiently alleges that her arrest and detainment were discretionary and occurred only because Defendants wanted to coerce her cooperation in finding Reyes, not to secure her presence at immigration and removal proceedings.

For these reasons Defendants' motion to dismiss Carranza's claim for abuse of process is denied.

*Conclusion*

For the reasons stated, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

DATED this ___ day of July, 2013.

JOHN V. ACOSTA
United States Magistrate Judge